IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 11, 2012 Session

## STATE OF TENNESSEE v. RAYMOND LEE SWETT, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 2009-C-2869     Steve Dozier, Judge**

_____

**No. M2011-00439-CCA-R3-CD - Filed January 4, 2013**

_____

The defendant, Raymond Lee Swett, Jr., appeals his Davidson County Criminal Court jury convictions of aggravated burglary, especially aggravated kidnapping, second degree murder, and felony murder, claiming that (1) the evidence was insufficient to support his convictions of especially aggravated kidnapping, second degree murder, and felony murder; (2) the trial court erred by refusing to grant his motion for a mistrial; (3) the trial court erred by effectively amending the indictment via the instructions to the jury; and (4) the sentence was excessive. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., delivered the opinion of the Court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Joy Kimbrough, Nashville, Tennessee, for the appellant, Raymond Lee Swett, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Rachel Sobrero and J. Wesley King, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The facts of this case are largely undisputed. Following a drug deal gone awry, the defendant and Calvin Hargrove went to the apartment of Jessica Cain-Beaty, and, while there, the defendant struck Ms. Cain-Beaty repeatedly with a gun while demanding the return of money he believed was owed to him as a result of the drug transaction. After one of Ms. Cain-Beaty's friends gave him the money, the defendant left the apartment and walked toward the exit of the apartment complex. Just before the defendant reached the exit, Jeffrey

Beaty, Ms. Cain-Beaty's estranged husband, confronted him. The defendant warned Mr. Beaty with the gun while walking backward toward the exit. When Mr. Beaty continued to advance, the defendant shot him.

At trial, Ms. Cain-Beaty testified that early in the day on May 24, 2009, the defendant, whom she knew as Skeet, telephoned her to inquire about purchasing prescription pills from her, and she agreed to give him 10 pills that had a street value of $20 and $20 cash in exchange for $40 worth of powder cocaine. After they struck the deal, the defendant arrived in the parking lot outside her apartment in a vehicle being driven by an individual she did not know. Ms. Cain-Beaty described what happened next:

> I went to the window and I gave him the bottle of pills, the ten pills, and twenty dollars cash. And then I waited for what I thought I was supposed to get and he said he had already . . . given it to me. And I said this . . . isn't right. And I proceeded to grab the twenty off his lap and . . . I went back inside.

She said that instead of $40 worth of powder cocaine, the defendant had given her "just a little tiny crumb of something" that "there wasn't enough to do." She put the cocaine under her bathroom sink. She said that she talked to her friends, Major Drinks and Justin Harmer, "for about five minutes" and that she went into her apartment alone.

Ms. Cain-Beaty testified that approximately five to 10 minutes later, Mr. Drinks and Mr. Harmer returned to the apartment and told her that the defendant and the other man had returned. She said that she "got the door open enough to let" Mr. Harmer inside the apartment, but she was forced to leave Mr. Drinks outside; she shut the door and locked the three locks to prevent the defendant's entering. Ms. Cain-Beaty testified that when she told the defendant that she was going to telephone the police, the defendant said, "I don't care if you call the cops" and then kicked in the door. The defendant, who was armed with a handgun, grabbed Ms. Cain-Beaty by the hair and dragged her into the bathroom, where he hit her in the head with the gun a number of times and kicked her in the head and face "repeatedly." During the beating, the defendant demanded the return of "his twenty dollars." Ms. Cain-Beaty said that the defendant did not give her "any kind of chance to ever get" the money and that she did not have the money because she had originally borrowed it from Mr. Harmer and had returned it to him after the deal soured.

According to Ms. Cain-Beaty, her neighbor, Mikhol Preston, arrived at some point and gave the defendant $20 so that he would leave. She said that the defendant broke her nose with the gun and kicked her in the head before leaving through the broken door. "About thirty seconds after that then the door opened again, but it wasn't them, it was Jeff."

Mr. Beaty asked what had happened and where her attacker had gone, and she told Mr. Beaty that "they had guns and they were crazy" and begged him not to go after the men. She said that Mr. Beaty ignored her pleas and left the apartment through the patio door. She eventually managed to gain her feet and walked toward the door of the apartment. Ms. Cain-Beaty testified that before she could get out of the apartment, she heard a single gunshot. She went outside and saw Mr. Beaty lying in the parking lot.

During cross-examination, Ms. Cain-Beaty admitted to heavy drug use around the time of the offenses but denied using drugs on that particular day. She also admitted smoking crack cocaine with the defendant on an earlier occasion but denied having a sexual relationship with him. Ms. Cain-Beaty conceded that she lied to police about her association with the defendant during an initial interview but said that she later disclosed that the attack came on the heels of a botched drug deal.

Major Drinks testified that he was living with Ms. Cain-Beaty at the time of the offenses, but the two were not romantically involved. On May 24, 2009, the defendant called Ms. Cain-Beaty to inquire about purchasing some prescription pills. Mr. Drinks said that he was standing in the breezeway of the apartment building when the defendant arrived in a sport utility vehicle ("SUV") being driven by a person that Mr. Drinks did not recognize. He recalled seeing Ms. Cain-Beaty and Mr. Harmer approach the passenger side window of the SUV and hearing Ms. Cain-Beaty say, "Somebody's trying to beat me, he's trying to beat me." Mr. Drinks said that Ms. Cain-Beaty "snatched" some money from the defendant and walked back toward her apartment.

After observing the SUV exit the parking lot, Mr. Drinks walked with Mr. Harmer back to Ms. Cain-Beaty's apartment. Before they reached the apartment, they saw the SUV return. Mr. Drinks said that Mr. Harmer ran to Ms. Cain-Beaty's apartment and shut the door. The driver parked the SUV, and the defendant and another man got out of the SUV armed with guns. The men asked Mr. Drinks where Ms. Cain-Beaty had gone, and he told them that he did not know. The men then pounded on Ms. Cain-Beaty's door, demanded that she open it, and ordered her to return the money. The man with the defendant kicked the door in, and the defendant entered through the broken door. Mr. Drinks walked in behind him. Mr. Drinks said that once inside the apartment, the defendant grabbed Ms. Cain-Beaty and dragged her to the bathroom. Mr. Drinks testified that although he could not see into the bathroom area, he heard Ms. Cain-Beaty screaming and heard the defendant's companion say, "Why are you beating her like that?" Shortly thereafter, the man told the defendant that he was leaving and left the apartment via the sliding glass door.

Mr. Drinks said that he followed the man out of the apartment and saw the man get into the SUV and leave. He then went to look for Mr. Harmer, whom he had seen leave

the apartment just before the defendant's companion. When he could not find Mr. Harmer, Mr. Drinks walked back toward Ms. Cain-Beaty's apartment. Mr. Drinks testified that as he neared her apartment, he saw Mr. Beaty go into Ms. Cain-Beaty's apartment. The defendant, he said, had already exited Ms. Cain-Beaty's apartment and was walking across the parking lot. Shortly thereafter, Mr. Beaty came out of the apartment and asked Mr. Drinks where the defendant had gone. Mr. Drinks said that he pointed the defendant out but warned Mr. Beaty that the defendant was armed. Mr. Drinks said that Mr. Beaty "seemed calm" and that Mr. Beaty claimed that "he wanted to speak with the gentleman in a calm manner." Mr. Drinks testified that he followed Mr. Beaty, who was walking at a "normal pace," from a short distance. Mr. Drinks said that as they approached the defendant, the defendant began to back away but told Mr. Beaty, "I got something for you." Mr. Drinks said that when Mr. Beaty was approximately "two or three feet in front of" the defendant, the defendant raised his gun and shot Mr. Beaty. After the defendant shot Mr. Beaty, the SUV, which had returned just before the shooting, drove away, and the defendant ran away in the same direction.

During cross-examination, Mr. Drinks admitted that he had sold prescription pills for Ms. Cain-Beaty before and that he told police that Ms. Cain-Beaty had been "turning tricks with" the defendant the day before the offenses. Mr. Drinks said that despite the defendant's warning Mr. Beaty off, Mr. Beaty continued to approach him.

Mikhol Preston testified that at the time of the offenses, she lived in the apartment directly above Ms. Cain-Beaty's. On that day, she heard "a lot of noise coming from outside," so she looked out her window and saw Ms. Cain-Beaty getting out of a black SUV. Ms. Preston said that she returned to what she had been doing, but she went downstairs to investigate when she heard Ms. Cain-Beaty yell several times. She testified that as soon as she got downstairs, Ms. Cain-Beaty rushed her into Ms. Cain-Beaty's apartment and locked the door. The two women went into the bedroom, "and before [they] could even start speaking again, [they] heard a noise[,] and . . . two other gentlemen entered her apartment." Ms. Preston said that the men were armed and that the defendant shouted, "Where is my money, where is my money?" She testified that the defendant then took Ms. Cain-Beaty "by the arm and led her into the bathroom." Ms. Preston said that she heard "a loud smacking noise" followed by Ms. Cain-Beaty's screaming, "Stop, please stop hitting me." She recalled that the defendant's companion, whom she identified as Calvin Hargrove, shouted for the defendant to "come on," and when the defendant did not respond, the man left. Mr. Drinks and Mr. Harmer left the apartment behind Mr. Hargrove.

At that point, Ms. Preston testified, the defendant dragged Ms. Cain-Beaty back into the living area of the apartment. He hit her again and demanded the return of his money. Ms. Preston said that she asked the defendant how much money was owed to him, and he told her that Ms. Cain-Beaty owed him $20. Ms. Preston said that she got $20 from her own

purse and gave it to the defendant. The defendant struck Ms. Cain-Beaty "a few more times and kicked her" before he left the apartment.

Ms. Preston testified that she got her purse and attempted to leave when Ms. Cain-Beaty asked her to record the license tag number of the SUV. Ms. Preston said that although she agreed, she "wasn't going to go out there and get the license plates" because she "was too scared." When she exited the apartment, she saw Mr. Beaty running toward Ms. Cain-Beaty's apartment. After Mr. Beaty went inside the apartment, Ms. Preston went to a neighbor's house and knocked on the door until someone let her inside.

Metropolitan Nashville ("Metro") Police Deparment Officer Ashley Kendall Coon responded to the call of a shooting at the Pagoda Apartment Complex at approximately 11:00 p.m. on May 24, 2009. When Officer Coon arrived at the complex, he observed Mr. Beaty's body lying "roughly thirty feet" from the front of the apartment complex. Ms. Cain-Beaty was near the body, and "she appeared to be cut up, looked to have been beat on." He said that "she was basically just in a basic state of hysteria" and that, as a result, he was unable to get any information from her. He called an ambulance and tried to obtain information from other witnesses at the scene.

Metro Officer Carroll Fondaw testified that he assisted in setting up the crime scene and that he requested and reviewed surveillance video recorded from the Walmart located across the street from the Pagoda Apartments. He said that video cameras recorded a dark SUV pull into the Pagoda apartments at 10:53 p.m. The same vehicle exited the apartment complex at 11:00 p.m. and returned at 11:08 p.m. The vehicle again exited the complex at 11:12 p.m. and returned at 11:14 p.m. The video then showed an individual running out of the apartment complex toward the Walmart approximately 30 seconds later. The SUV "followed, stopped briefly and then that subject got into that vehicle and then it appear[e]d as though that dark colored SUV continued east on Welch."

Jennifer Grubbs, an investigator with the medical examiner's office, testified that she responded to the Pagoda Apartments and pronounced Mr. Beaty dead at 2:20 a.m. She recalled that Mr. Beaty had "a black single drop blade knife" in his "right rear pocket" at the time he died. Ms. Grubbs removed the knife, along with Mr. Beaty's other personal possessions, and photographed them at the scene.

Shameka Saffold, custodian of records for Cricket Communications, testified that cellular telephone records showed that several calls were placed from a cellular telephone registered in the defendant's name to a cellular telephone registered in Ms. Cain-Beaty's name on May 24, 2009, in the hours leading up to the offenses. The last call was placed at 11:05 p.m. A call was placed to 9-1-1 from Ms. Cain-Beaty's cellular telephone

at 11:10 p.m.

Maxwell Alexander Delancy testified that on May 24, 2009, he was at Mr. Hargrove's house "conversating, hanging out" when the defendant arrived and spoke to Mr. Hargrove "about some sort of drug deal he had for Hargrove." Mr. Delancy heard the defendant tell Mr. Hargrove that the defendant had "a lady down there who has $20 and will give you $20 worth of some type of pills for $40 of crack." Mr. Delancy said that Mr. Hargrove asked him to drive the defendant to make the transaction and that he agreed because he owed Mr. Hargrove money. Mr. Delancy testified that the defendant directed him to the Pagoda Apartments and that when he pulled into a parking space, "[t]he white lady that [he] had seen came to the car, just directly to the car." He described what happened next:

> And they're conversating and she shows him – she gives him
> $20 already. And she gives him $20, he has the crack in his
> hand. As he's about to show her the crack, . . . she's opening up
> a pill bottle as well while he's about to open up . . . his hand.
> He's opening up his hand; she sees it. And she looks at it for a
> second; pauses and looks at it. And then she goes on. . . . No,
> no. You're not . . . about to get me. You're not about to get me.
> No. No. No. Just carrying on and pretty much just takes
> everything out of Swett's hand including her pills, including that
> $20 and the crack, and walks off.

After Ms. Cain-Beaty walked away, Mr. Delancy "threw [the] car in reverse and started driving." He said that he told the defendant that the defendant would be responsible for telling Mr. Hargrove what had happened. Mr. Delancy testified that the defendant said that he "didn't give a f*** that he got stolen from and he don't give a f*** about what Hargrove thinks."

Mr. Delancy said that he drove directly to Mr. Hargrove's residence. Once there, the defendant went inside first and told Mr. Hargrove what happened. Mr. Delancy recalled that Mr. Hargrove came to Mr. Delancy and told him that the defendant wanted Mr. Hargrove to provide him with drugs for setting up the deal with Ms. Cain-Beaty even though the deal went sour. Mr. Hargrove then asked Mr. Delancy to return him to the apartments to get his money back. Mr. Delancy said that he did not want to do so, and the two argued. At that point, Mr. Hargrove called in the debt that Mr. Delancy owed. Mr. Delancy testified that because he did not have the money to repay the debt, he agreed to take Mr. Hargrove and the defendant back to the Pagoda Apartments.

Mr. Delancy said that during the drive to the apartments, the defendant was "in

the back pissed off that Jessica even got over on him on this situation. And he's throwing himself everywhere around the car, and making a big scene in the car. Yeah, man; screaming, you know, I'm going to f*** this b**** up. She doesn't know me. She doesn't know who I am." Mr. Delancy testified that Mr. Hargrove told the defendant to "calm the f*** down, chill the f*** out, you're not going to do anything, just calm down." When they arrived at the apartments, Mr. Hargrove told the defendant to call Ms. Cain-Beaty, but the defendant was unable to do so, so the two men got out of the car and walked to the apartment. Mr. Delancy testified that "seven to ten minutes" passed before he saw someone come out of the sliding glass door and travel "straight up to another path of stairs." He then saw Mr. Hargrove stick his head out the sliding glass door, glance both ways, and then go back inside for "like 5, 10 seconds" before returning to Mr. Delancy's vehicle. When Mr. Hargrove got inside the vehicle, he told Mr. Delancy that the defendant was in the apartment "beating her." Mr. Delancy said that he told Mr. Hargrove to "go get him, he's going to kill somebody; go get his a**." Mr. Hargrove instead ordered Mr. Delancy to leave.

Mr. Delancy testified that he complied with the order and drove away. When they reached "the top of Welch Road," Mr. Hargrove "pull[ed] out a gun and thr[e]w it underneath the seat." At that point, Mr. Hargrove told Mr. Delancy to turn around and go back to the apartment to get the defendant because "he's going to kill somebody." Mr. Delancy said that when they pulled into the parking lot, he saw "two individuals on down inside the apartments along where the cars are parked and one other individual and Swett. The one individual is walking up on Swett, walking towards Swett. Swett keeps backing up; walking up on him." Mr. Delancy said that he pulled "right next to both of them," and Mr. Hargrove told the defendant to "quit f***ing around, get in the car." The defendant backed away and the other individual kept walking toward him. Mr. Delancy rolled the car forward to the point where both individuals were behind it. At that point, the defendant shot the other individual.

Mr. Delancy testified that when he pulled out of the apartment complex, he "almost hit" the defendant, so he "slow[ed] down from snagging [the defendant] and [the defendant] opened [the] car door and gets in the car." The three returned to Mr. Hargrove's house, and Mr. Hargrove removed the gun from Mr. Delancy's car. Mr. Delancy said that he spoke briefly with Mr. Hargrove's mother and then left.

Mr. Delancy recalled that at some later date, Mr. Hargrove called Mr. Delancy and said, "[Y]ou need to come over to my house and you need to get this story together so what I said to the detectives and what you're going to say to the detectives hopefully coincides together and doesn't make it look like he was leaving anything out of his story." According to Mr. Delancy, Mr. Hargrove also told Mr. Delancy to tell police that they did not pick the defendant up after the shooting.

During cross-examination, Mr. Delancy admitted that he lied to police in his first two statements and only changed his story one month before the defendant's case was scheduled to go to trial. Mr. Delancy described the defendant as "a crack head" whom he had never seen with a gun before.

Associate medical examiner Adele Lewis, who did not perform the autopsy of Mr. Beaty, reported the conclusions of her colleague.[1] According to Doctor Lewis, Mr. Beaty suffered a single "gunshot wound on the left side of the upper part of the chest" that "struck the major blood vessel . . . from the heart to the rest of the body that's called the aorta. Then it hit the heart itself. Then it injured the major blood vessel that carries blood in the body to the lungs called the pulmonary trunk." The bullet "injured both lobes of the left lung; caused a bruise of the right lung. Again injured the major blood vessel that carries blood to the rest of the body lower down in its course" before it "exited partially through the . . . back." She testified that the wound would have caused death "within a matter of minutes." Based upon the absence of tattooing or soot on Mr. Beaty's clothing or skin, she determined that the fatal shot was fired from greater than three feet.

The State rested, and co-defendant Calvin Hargrove testified on his own behalf. Mr. Hargrove, who was 18 years old at the time of the offenses, testified that the defendant was a friend of his mother's and that he had known Mr. Delancy since they attended school together. He said that on May 24, 2009, the defendant came to him seeking $20 worth of cocaine. Mr. Hargrove stated that he gave the cocaine to the defendant, and the defendant paid him for the drugs. He denied any knowledge that the defendant and Mr. Delancy were going to meet with Ms. Cain-Beaty for a drug deal. He testified that Mr. Delancy arrived at his house at approximately 10:45 p.m., and the three men left ten minutes later to travel to Mr. Hargrove's girlfriend's house. Mr. Hargrove said that he was surprised when Mr. Delancy traveled to the Pagoda Apartments.

Mr. Hargove testified that when they arrived at the Pagoda apartments, the defendant went to Ms. Cain-Beaty's apartment. He said that he did not see the defendant in possession of a gun. Mr. Hargrove insisted that he stayed in the vehicle with Mr. Delancy until he "heard screaming and hollering." At that point, he said, he went to investigate and saw the defendant inside the apartment "beating" Ms. Cain-Beaty. He said that he told the defendant to stop and then left. Mr. Hargrove admitted that he had a gun in his pocket and that he placed his hand in his pocket, but he could not be sure whether others saw the gun.

---

[1]The defendant did not challenge the propriety of Doctor Lewis' testifying about the contents of her colleague's report. *See State v. James Drew Freeman, Jr.*, No. M2011-00184-CCA-R3-CD (Tenn. Crim. App., Nashville, May 9, 2012).

Mr. Hargrove testified that when he returned to the SUV, he told Mr. Delancy to leave. Soon after they left, Mr. Delancy expressed a desire to go back to the apartment complex to "see what was going on." When they pulled into the parking lot, Mr. Hargrove saw the defendant walking and "three other people coming toward him." Mr. Hargrove described what happened next: "And that's when Skeet had turned around and they kept approaching him. Then the other two guys, they kind of stayed back. And the other guy kept coming closer." He said that the defendant started "kind of walking backwards." The two men were yelling at one another. Mr. Hargrove testified that he did not see the actual shooting because the men moved behind the SUV.

The defendant testified that at the time of the offenses, he did not have a job and was "strung out because [he] was getting drunk and high every day." He stated that he first met Ms. Cain-Beaty approximately one week before the offenses and that he told her that he "would trade some dope for sex" and that she agreed. He said that they both used drugs, had sex, and exchanged phone numbers before he left. "[A] couple of days" later, he called her, and the two used drugs together again but did not have sex. On May 24, 2009, the defendant saw Ms. Cain-Beaty as he was walking through the apartment complex, and she asked if he would trade her cocaine for her pills. The defendant said that when he told her he didn't think that would work, she offered to sell the pills for cash. The defendant testified that he told Ms. Cain-Beaty that he was not interested in buying them, but he would try to find a buyer for her. Eventually, Ms. Cain-Beaty told him that she did not want to sell her pills but wanted to trade them for crack. He said that they finally agreed that Ms. Cain-Beaty would give the defendant 10-12 pills plus $20 cash in exchange for $40 worth of crack cocaine. The defendant said that he "got ahold of some people for her and set the deal up" and then traveled to the apartment complex with Mr. Delancy. The defendant said that he was to get "a little bump" of cocaine for his personal use as payment for his setting up the transaction.

According to the defendant, when they arrived at the apartment complex, he showed Ms. Cain-Beaty the cocaine, and she gave him the money and the pills. At that point, she said, "[O]h, no, man, f*** that" and "[s]natched everything out of [his] hand." The defendant testified that Mr. Delancy told him that they needed to "tell [Mr. Hargrove] what the f*** went down," so they returned to Mr. Hargrove's house. After some conversation, the three men decided to return to Ms. Cain-Beaty's apartment to "discuss it." The defendant said that he believed that Ms. Cain-Beaty probably wanted him to give her more cocaine.

The defendant testified that when they arrived at Ms. Cain-Beaty's apartment, Mr. Hargrove refused to let the defendant go into the apartment alone, and Mr. Delancy encouraged the defendant to go armed and provided the gun. The defendant said that he held the gun in his hand rather than putting it in his pocket because he was "not really familiar

-9-

with guns." He knocked on the door, but no one answered. The defendant said that he stepped over to the sliding glass door of the apartment but "[b]efore [he] got around the bushes, the door was kicked in." He claimed that he did not intend to frighten Ms. Cain-Beaty. The defendant denied kicking in the door but admitted that he entered the apartment through the fallen door and walked directly to Ms. Cain-Beaty. He said that he demanded the return of his money, and Ms. Cain-Beaty, who "had a little thing tied around her arm," "looked like she was surprised." He said that when he demanded the return of his money a second time, Ms. Cain-Beaty feigned surprise and told him to "get the f*** out of here." The defendant acknowledged that at that point, he struck her with the gun, and she fell to the floor with her head in the bathroom. He denied that Ms. Cain-Beaty had her cellular telephone in her hand during the encounter. Instead, he said, she had a syringe in one hand. He said that he again demanded the money and admitted that he struck Ms. Cain-Beaty again after "she gave the ol' glare, you know, just get the f*** out of my face."

The defendant testified that he believed that he struck Ms. Cain-Beaty "four or five times" and that he stopped hitting her when he "raised up and . . . seen all that blood." When he turned around, Ms. Preston gave him $20, and he left. He said that he did not ask Ms. Preston for money. Nevertheless, he "put it in [his] pocket and walked out the front door." When he got outside, he saw that Mr. Delancy was gone. He said that he walked away "not running but . . . . trying to get out of there."

According to the defendant, as he walked across the parking lot, he heard someone say "hey, mother f*****" like they knew him, but he did not turn around. When he heard it a second time, he "turned around and looked and it was this dude running up on" him. He said that he told the man to back off, but the man kept "coming with his hand behind his back." When the man got closer, he said, "Yeah, n*****, I got your a** now. I'm going to kill you. I got you." The defendant said that he kept backing away in an attempt to reach the street so that he could run away. The defendant testified that he was frightened and believed the man intended to kill him. At that point, the defendant raised his gun and fired a single shot. He insisted that he did not aim the gun at Mr. Beaty. The defendant said that after firing the shot, he "took off running" and got into the SUV driven by Mr. Delancy as it pulled into the apartment complex.

The defendant insisted that he did not know he had killed Mr. Beaty. He admitted that he never saw Mr. Beaty in possession of a weapon but maintained that he believed, based upon Mr. Beaty's carriage and demeanor, that he was armed.

During cross-examination, the defendant testified that he made it almost to the apartment complex entrance before being confronted by Mr. Beaty. He claimed he could barely recall his interview with the police on the day after the shooting and that he could not

-10-

recall in any detail what he said. He admitted that he had lied because he was "drunk and high" and that he did not tell police that he shot Mr. Beaty in self-defense.

Upon this proof, the jury convicted the defendant of felony murder and second degree murder based upon the death of Mr. Beaty and of the especially aggravated kidnapping of Ms. Cain-Beaty and the aggravated burglary of her apartment. The jury acquitted the defendant of the especially aggravated kidnapping of Major Drinks, the especially aggravated kidnapping of Justin Harmer, the especially aggravated kidnapping of Mikhol Preston, the attempted first degree murder of Jessica Cain-Beaty, and the especially aggravated robbery of Jessica Cain-Beaty. The trial court merged the conviction of second degree murder into the conviction of felony murder and imposed a life sentence for the merged conviction.[2] Following a sentencing hearing, the trial court imposed a sentence of 22 years for the conviction of especially aggravated kidnapping and a sentence of six years for the conviction of aggravated burglary. The court ordered partially consecutive service of the sentence for a total effective sentence of life plus 22 years' incarceration.

## I. Sufficiency

The defendant levies two attacks on the sufficiency of the convicting evidence, claiming first that the trial court erred by denying his motion for a judgment of acquittal on the charge of felony murder at the close of the State's proof and second that the totality of the evidence adduced at trial did not support his convictions of especially aggravated kidnapping, second degree murder, or felony murder.

The defendant claims that the trial court erred by denying his motion for judgment of acquittal at the close of the State's proof because the State failed to establish that the defendant committed burglary, the predicate felony charged in the felony murder indictment. The defendant made two motions for judgment of acquittal, one at the close of the State's proof and another with his motion for new trial. Rule 29 of the Tennessee Rules of Criminal Procedure provides, in relevant part, as follows:

> The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Tenn. R. Crim. P. 29(a).

---

[2]The trial court also noted a sentence of 23 years for the conviction of second degree murder.

This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the State rests or at the conclusion of all the evidence. *See generally Overturff v. State*, 571 S.W.2d 837 (Tenn. 1978). At the point the motion is made, the trial court must favor the opponent of the motion with the strongest legitimate view of the evidence, including all reasonable inferences, and discard any countervailing evidence. *Hill v. State*, 470 S.W.2d 853, 858 (Tenn. Crim. App. 1971).

As for the defendant's first motion, we note that the defendant chose to offer proof following the trial court's denial of his motion for a judgment of acquittal at the close of the State's proof. As such, he has waived his right to appeal the denial of this motion. *See Finch v. State*, 226 S.W.3d 307, 317 (Tenn. 2007) (declining to revisit the waiver rule promulgated in *State v. Mathis*, 590 S.W.2d 449, 453 (Tenn. 1979)); *see also State v. Johnson*, 762 S.W.2d 110, 121 (Tenn. 1988); *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). The defendant's second motion for judgment of acquittal was made at the close of all proof, and accordingly, our review of the sufficiency of the evidence is not based solely on the evidence offered during the State's case-in-chief but must also necessarily include the proof offered by the defendant.

The standard by which the trial court determines a motion for judgment of acquittal is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction. *Ball*, 973 S.W.2d at 292; *State v. Anderson*, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994). That is, "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e). Because the standard of review and the body of evidence reviewed is identical for the defendant's contentions that the trial court erred by denying his motion for judgment of acquittal and that the convicting evidence was legally insufficient, we may dispose of both issues through the same analysis.

Again, our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson*, 443 U.S. at 324; *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the

weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

*Especially Aggravated Kidnapping*

The defendant contends that the evidence was insufficient to support his conviction of especially aggravated kidnapping because the State failed to establish that the defendant removed or confined Ms. Cain-Beaty so as to substantially interfere with her liberty, arguing that the "brief interaction" between the defendant and Ms. Cain-Beaty was "essentially incidental" to the aggravated assault of the victim. The State contends that the evidence sufficiently established the elements of especially aggravated kidnapping.

As charged in this case, especially aggravated kidnapping is "false imprisonment, as defined in § 39-13-302 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-305(a)(4) (2006). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a).

The defendant's argument that his confinement of Ms. Cain-Beaty was essentially incidental to the assault he committed on her and his reliance on *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991), is misplaced. In *Anthony*, our supreme court acknowledged that a period of confinement technically meeting the definition of kidnapping frequently accompanies such crimes as robbery and rape, that a separate kidnapping conviction cannot be supported when "the confinement, movement, or detention [was] essentially incidental to the accompanying felony," and that, to protect the defendant's right to due process, reviewing courts should determine "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction." *State v. Anthony*, 817 S.W.2d 299, 306 (Tenn. 1991).

The *Anthony* ruling underwent several revisions in the ensuing two decades before being explicitly overruled by our supreme court in *State v. White*, 362 S.W.3d 559 (Tenn. 2012). In *White*, the court dispensed with the separate due process analysis first promulgated in *Anthony* and concluded that the jury's finding beyond a reasonable doubt all the elements of kidnapping coupled with the reviewing court's "task . . . of assessing the

-13-

sufficiency of the convicting evidence" is sufficient to protect the defendant's due process rights. *State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012). Although it overruled *Anthony* and its progeny, the court retained the requirement that the State establish that the removal or confinement of the victim went beyond that necessary to accomplish the accompanying offense, classifying it as a question of fact to be determined by a jury "properly instructed under the law." *Id.* at 577. Given this holding, the court determined that

> [w]hen jurors are called upon to determine whether the State has proven beyond a reasonable doubt the elements of kidnapping, aggravated kidnapping, or especially aggravated kidnapping, trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction.

*Id.* at 578.

The *White* court classified the question originally posed in *Anthony* as strictly a jury issue and held that the jury should be properly instructed. The trial court in this case erred by failing to provide the instruction promulgated by *White* because the defendant was originally charged with the especially aggravated kidnapping and aggravated robbery of Ms. Cain-Beaty. *See State v. David Earl Scott*, No. E2011-00707-CCA-R3-CD, slip op. at 14-17 (Tenn. Crim. App., Knoxville, Nov. 14, 2012). That being said, the jury convicted the defendant only of especially aggravated kidnapping. Consequently, the trial court's erroneous failure to properly instruct the jury can be classified as harmless beyond a reasonable doubt. *White*, 362 S.W.3d at 580; *see also id.* n. 20 (indicating that the issue is subject to constitutional harmless error analysis by stating that remand for a new trial was warranted in *White* because the court could not "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the instructional error"); *see also David Earl Scott*, slip op. at 17.

That the defendant also assaulted Ms. Cain-Beaty is irrelevant because he was not charged with that crime. Thus, no due process issue attends the defendant's conviction of especially aggravated kidnapping.

The evidence established that the defendant broke into Ms. Cain-Beaty's apartment and drug her from the front room of the apartment into the bathroom. He kept her in the bathroom while he beat her and demanded the return of $20. Throughout the offense, the defendant brandished a handgun. This evidence supports the defendant's conviction of especially aggravated kidnapping.

-14-

*Second Degree Murder*

The defendant contends that the evidence was insufficient to support his conviction of second degree murder because the proof established that he shot Mr. Beaty in self-defense.

As charged in this case, "[s]econd degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210(a)(1). Affording the State the strongest legitimate view of the evidence and deferring to the credibility determinations made by the jury, we conclude that the evidence supports the defendant's conviction of second degree murder. The evidence established that the defendant shot Mr. Beaty, who was unarmed, one time in the chest. Although the defendant claimed that he shot Mr. Beaty in self-defense, the jury rejected this testimony, as was its prerogative.

*Felony Murder*

The defendant challenges the sufficiency of the evidence supporting his conviction of felony murder on two grounds: first, that the State failed to establish that he committed the murder in the perpetration of a burglary, as was charged in the indictment; and second, that the State failed to establish a sufficient connection between the aggravated burglary of Ms. Cain-Beaty's apartment and the murder of Mr. Beaty.

First degree murder, as charged in this case, is "[a] killing of another committed in the . . . attempt to perpetrate any . . . burglary." T.C.A. § 39-13-202(a)(2). "Aggravated burglary is burglary of a habitation as defined in §§ 39-14-401 and 39-14-402." *Id.* § 39-13-403(a). Burglary, as is applicable in this case, is committed when a person "without the effective consent of the property owner . . . [e]nters a building . . . with the intent to commit a felony." *Id.* § 39-14-402(a)(1).

It is well established that before a killing will "fall within the definition of felony murder, [it] must have been 'done in pursuance of the unlawful act, and not collateral to it.'" *State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Rice*, 184 S.W.3d 646, 663 (Tenn. 2006) (quoting *Farmer v. State*, 296 S.W.2d 879, 883 (1956))). "In other words, 'The killing must have had an intimate relation and close connection with the felony . . . , and not be separate, distinct, and independent from it[.]'" *Farmer*, 296 S.W.2d at 883 (quoting *Wharton on Homicide*, § 126 (3rd ed.)); *see also, e.g.*, *Banks*, 271 S.W.3d at 140; *State v. Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005). To satisfy the requirement of "an intimate relation and close connection," "the killing 'may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action.'" *Thacker*, 164 S.W.3d

at 223 (quoting *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999)). Moreover, "there should be a causal connection between the killing and the felony." *Buggs*, 995 S.W.3d at 106 (citing *Farmer*, 296 S.W.2d at 884; *State v. Severs*, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988)). Requiring a causal connection between the homicide and the underlying felony promotes the deterrent effect of the rule by precluding a first degree murder conviction for "killings which are collateral to and separate from the underlying felony." *State v. Pierce*, 23 S.W.3d 289, 295 (Tenn. 2000). "Moreover, requiring a close nexus between the [underlying felony] and the killing is particularly appropriate given that the felony murder rule is 'a legal fiction in which the intent and the malice to commit the underlying felony is 'transferred' to elevate an unintentional killing to first-degree murder.'" *Id.* (quoting *Buggs*, 995 S.W.2d at 107).

A killing will be considered to have been committed "in the perpetration of" the underlying felony "where the homicide is so closely connected with the underlying felony as to be within the *res gestae* thereof, or where the homicide is so linked to the felony as to form one continuous transaction." *Buggs*, 995 S.W.3d at 106 (citing 40 Am. Jur. 2d *Homicide* § 67 (1999)). "The *res gestae* embraces not only the actual facts of the transaction and the circumstances surrounding it, but also the matters immediately antecedent to the transaction and having a direct causal connection with it, as well as acts immediately following it and so closely connected as to form in reality a part of the occurrence." *State v. Patrick Wingate*, No. M1999-00624-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Nashville, May 25, 2000) (citing *Payne v. State*, 406 P.2d 922, 925 (Nev. 1965)). When determining whether a killing falls within the felony murder rule, the courts of this state "have noted that consideration of such factors as time, place, and causation is helpful." *Patrick Wingate*, slip op. at 9 (citing *State v. Lee*, 969 S.W.2d 414, 416 (Tenn. Crim. App. 1997) (holding that when victim was killed in a collision that followed a high-speed chase as defendant fled from the scene of a robbery, the homicide occurred in the furtherance of the robbery because flight from the scene of a crime is an integral part of the crime); *State v. Brown*, 756 S.W.2d 700, 702-03 (Tenn. Crim. App. 1988) (holding that the fact that robbery was complete before the victim was killed did not make the murder "collateral" to the robbery where defendant picked up the victim with the intent of robbing him and killed him to prevent identification)); *see also Pierce*, 23 S.W.3d at 294-95 (stating that "the majority of courts in other jurisdictions also consider whether the killing and the felony are closely connected in time, place, causation, and continuity of action" and citing Wayne R. LaFave and Austin W. Scott, Jr., *Substantive Criminal Law*, § 7.5(f) (1986); Erwin S. Barbre, Annotation, *What Constitutes Termination of Felony for Purpose of Felony-Murder Rule*, 58 A.L.R.3d 851, 865-74 (1974); 40 Am. Jur. 2d *Homicide* § 67 (1999); *State v. Mims*, 956 P.2d 1337, 1344 (Kan. 1998); *State v. Lashley*, 664 P.2d 1358, 1368 (Kan. 1983); *Commonwealth v. Padgett*, 691 N.E.2d 239, 244 (Mass. App. Ct. 1998); *State v. Brown*, 940 P.2d 546 (Wash. 1997); *State v. Wade*, 490 S.E.2d 724, 738 (W. Va. 1997)). "'Something more than a mere coincidence of time and place between the wrongful act and the death is

necessary.'" *Marshall v. United States*, 623 A.2d 551, 560 (D.C. 1992) (quoting *United States v. Heinlein*, 490 F.2d 725, 736 (1973)); *see also Patrick Wingate*, slip op. at 9 (citing *Farmer*, 296 S.W.2d at 883).

Importantly, "where there is a break in the chain of events between the felony and the killing, the homicide will not fall within the felony-murder doctrine." *Buggs*, 995 S.W.3d at 106. "One of the most important factors to consider in determining whether there has been a break in the chain of events that would preclude application of the felony murder rule is whether the felon has reached a place of temporary safety." *Pierce*, 23 S.W.3d at 295 (citing LaFave & Scott, *Substantive Criminal Law*, § 7.5(f)(1)). "If the felon has gained a place of temporary safety after commission of the felony and before the killing, the felony murder rule generally does not apply." *Id.*

The causal connection between the underlying felony and the killing also depends upon the character of the underlying felony. For example, our courts have consistently held in cases when the predicate felony was robbery that because "asportation is an element of robbery, the felony is still in progress while the defendant is fleeing from the scene with the stolen property." *Lee*, 969 S.W.2d at 416-17; *see also Brown*, 756 S.W.2d at 701; *State v. Hopper*, 695 S.W.2d 530, 535-36 (Tenn. Crim. App. 1985) (holding that "because the murder occurred during the robbers' flight from the scene of the robbery and because their flight was 'part and parcel' of the robbery event, the murder occurred in the perpetration of the robbery"). When the predicate felony is theft, the killing must be "closely connected to the initial taking of the property in time, place, causation, and continuity of action." *See Pierce*, 23 S.W.3d at 296 (citing *Lester v. State*, 737 So. 2d 1149, 1151 (Fla. Dist. Ct. App. 1999) (holding that the felony murder rule does not apply when the defendant, fleeing from police in a vehicle stolen by another person, collided with another car, killing the driver); *Allen v. State*, 690 So. 2d 1332, 1334 (Fla. Dist. Ct. App. 1997) (holding that the felony murder rule does not apply when the defendant, while driving a stolen vehicle, was involved in a car accident that resulted in the other motorist's death); *Doane v. Commonwealth*, 237 S.E.2d 797, 798 (Va. 1977) (holding that the felony murder rule does not apply where the defendant stole a car one day and the next day had an automobile accident in the stolen vehicle which resulted in the death of one of the passengers in the stolen vehicle); *Montague v. Commonwealth*, 522 S.E.2d 379, 381 (Va. Ct. App. 1999) (holding that the felony murder rule does not apply to a killing that resulted when the defendant, in a vehicle he had stolen the previous day, fled from police who had attempted to stop him for making a u-turn and struck another vehicle)). This court upheld a conviction of felony murder in the perpetration of an aggravated burglary when the homicide "occurred at the victim's residence within ten to fifteen minutes" of the initial illegal entry of the residence. *State v. Michael Lynn Stanton*, No. E2003-02675-CCA-R3-CD, slip op. at 13 (Tenn. Crim. App., Knoxville, Apr. 15, 2005). "In short, whether there is a sufficient causal

connection between the felony and the homicide depends on whether the [principal's] felony dictated his [or her] conduct which led to the homicide.'" *Marshall*, 623 A.2d at 560 (citation omitted) (alteration in *Marshall*).

In this case, the defendant committed the crime of aggravated burglary by entering Ms. Cain-Beaty's residence with the intent to commit a felony, and the defendant does not challenge his conviction of aggravated burglary. After the defendant left Ms. Cain-Beaty's residence, he walked toward the entrance of the apartment complex because Mr. Hargrove and Mr. Delancy had already left in the SUV. Less than 30 feet from the entrance, the defendant was confronted by Mr. Beaty. Although Mr. Beaty was not a party to the earlier burglary of Ms. Cain-Beaty's residence, the confrontation came only minutes after the burglary, and the burglary and assault on Ms. Cain-Beaty prompted Mr. Beaty to challenge the defendant. Although the defendant clearly intended to withdraw to a place of safety, he had not yet done so. Under these circumstances, the State established a sufficient causal connection between the killing of Mr. Beaty and the aggravated burglary of Ms. Cain-Beaty's residence. His conviction of felony murder is, therefore, affirmed.

## *II. Denial of Mistrial*

The defendant contends that the trial court erred by denying his motion for a mistrial. The State erroneously asserts that the defendant has asserted this ground for relief for the first time on appeal. The record establishes that defense counsel asked for a mistrial during trial and raised the issue in a timely-filed motion for new trial.

Defense counsel requested a mistrial on grounds that both she and Mr. Hargrove's counsel promised the jury during opening statements that they would present certain evidence and then failed to present the evidence. The trial court denied the motion, observing that opening statements are not evidence and that counsel had the opportunity to explain the failure in her closing argument.

The decision to grant or deny a mistrial is entrusted to the sound discretion of the trial court, and this court will disturb the trial court's ruling in this regard only when there has been an abuse of the trial court's discretion. *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003) (citing *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State*

*v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The burden of establishing the necessity for mistrial lies with the party seeking it. *Id*.

The defendant has failed to establish that the trial court abused its discretion by refusing to grant a mistrial. That the statements made by counsel for the defendants during opening were not later supported by evidence did not inflict "damage . . . to the judicial process" so as to "preclude[] an impartial verdict." *See id.*

### III. Constructive Amendment

The defendant contends that the trial court constructively amended the count of the indictment charging felony murder by instructing the jury that aggravated burglary was the predicate felony for the charge. The State contends that the trial court committed no error.

The defendant has failed to support this issue with argument, citation to the record, or citation to relevant authorities.[3] Consequently, the issue is waived. *See* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument, "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on; and . . . for each issue, a concise statement of the applicable standard of review"); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Moreover, the defendant is not entitled to relief on this issue. The indictment in this case alleged that the defendant killed Mr. Beaty during the perpetration of "a burglary." The trial court instructed the jury that it must find that the defendant killed Mr. Beaty during the perpetration of an aggravated burglary.

---

[3]Despite the defendant's filing a detailed designation of the record to be transmitted on appeal, the record actually sent to this court was in complete disarray. The transcript of the trial was incomplete, and the record did not contain the transcript of the trial court's instructions to the jury or the written instructions provided. The defendant filed a motion to supplement the record with the missing transcripts as well as the jury instructions. The supplemental record transmitted by the trial court clerk was again incomplete, and the supplemental record contained a large amount of duplicate information. Again, the defendant moved to supplement the record with the missing information. Notably, the defendant indicated in his brief an intention to file a supplemental brief after the appellate record was made whole. Despite that it appears that this court is finally in possession of the entire transcript of the trial and all other relevant proceedings, the defendant did not file a supplemental brief to correct the deficiencies relative to this issue.

When the essential elements of an offense alleged in an indictment differ from the facts established at trial, the variance has been described as resulting in a constructive amendment.

> [A] constructive amendment of the indictment occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged. . . . In such cases, reversal is automatic, because the defendant may have been convicted on a ground not charged in the indictment. . . . If, on the other hand, the variation between proof and indictment does not effectively modify an essential element of the offense charged, "the trial court's refusal to restrict the jury charge to the words of the indictment is merely another of the flaws in trial that mar its perfection but do not prejudice the defendant."

*Goodson*, 77 S.W.3d at 244. Again, "not only must the government prove the crime it charges, it must charge the crime it proves" and "after an indictment has been returned, its charge may not be broadened or changed except by action of the grand jury." *Id.* (citations omitted). A constructive amendment of the indictment, not consented to by the defendant, by definition results in a fatal variance because it does not accomplish the "overriding purpose of notice to the accused" required of an indictment. *See State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000).

Here, the State alleged that the defendant killed Mr. Beaty during the perpetration of a simple burglary, which by definition is the burglary of a building other than a habitation, *see* T.C.A. § 39-14-402(a)(1), but the proof adduced at trial established that the only burglary committed was the burglary of Ms. Cain-Beaty's apartment, which qualifies as an aggravated burglary, *see id.* § 39-14-403(a). That being said, because the instruction on aggravated burglary as the predicate felony did not modify an essential element of the charged crime of felony murder in a manner that permitted the jury to convict the defendant "on a ground not charged in the indictment," *see Goodson*, 77 S.W.3d at 244, the instruction did not result in a constructive amendment of the indictment. The felony murder statute applies, in this case, when the defendant committed "any" burglary. *See* T.C.A. § 39-13-202(a)(2).

*IV. Sentencing*

Finally, the defendant contends that the sentence was excessive. The defendant failed to support his claim with argument, citation to the record, or citation to relevant

-20-

authorities. Instead, he states in a general manner that the trial court erred by enhancing the length of the individual sentences and by imposing partially consecutive sentences.[4]

Here, the trial court imposed a sentences of six years for the defendant's conviction of aggravated burglary, 22 years for the conviction of especially aggravated kidnapping, and 23 years for the conviction of second degree murder.[5] The trial court ordered the 22-year especially aggravated kidnapping sentence to be served consecutively to the life sentence imposed for the defendant's conviction of first degree murder and ordered the six-year sentence imposed for aggravated burglary to be served concurrently to the especially aggravated kidnapping sentence.

In arriving at each of the individual sentence lengths, the trial court found that the defendant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range. *See* T.C.A. § 40-35-114(1). With regard to the defendant's convictions of aggravated burglary and especially aggravated kidnapping, the court found that the defendant was the leader in an offense involving two or more criminal actors, *see id.* § 40-35-114(2), and that the defendant had no hesitation about committing a crime in which the risk to human life was high, *see id.* § 40-35-114(10). Finally, with regard to the convictions of aggravated burglary and second degree murder, the court found that the defendant employed a firearm during the commission of the offenses. *See id.* § 40-35-114(9).

The court ordered partially consecutive sentences on the basis of the defendant's extensive record of criminal activity, which included "22 non-traffic related misdemeanor convictions dating back 20 years, and the one robbery felony conviction, and the one prior probation violation." The court also based its consecutive sentencing decision on its finding that the defendant was a dangerous offender and that the aggregate sentence was necessary to protect the public from the defendant.

Since the passage of the 1989 Sentencing Act, our standard of review when considering challenges to the length and manner of service of a sentence has been de novo review with a presumption that the determinations of the trial court are correct. T.C.A. §

---

[4]Again, the defendant indicated an intent to file a supplemental brief following supplementation of the record with the remaining transcripts from trial and sentencing. Although the record was later supplemented, twice, with additional transcripts, the defendant did not file the promised supplemental brief.

[5]Although the trial court indicated that the 23-year sentence for second degree murder was to be served concurrently to the life sentence imposed for the conviction of first degree murder, the conviction of second degree murder merges into the conviction of first degree murder, and therefore no sentence is to be imposed. The judgments, however, accurately reflect the merger of offenses.

-21-

40-35-401(d) (2006) ("When reviewing sentencing issues raised pursuant to subsection (a), including the granting or denial of probation and the length of sentence, the appellate court shall conduct a de novo review on the record of the issues. The review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct."). In 2005, the general assembly amended the Sentencing Act to bring our sentencing law into compliance with federal constitutional requirements as enunciated in *Blakely v. Washington*, 542 U.S. 296 (2004), and its progeny. Notably, the 2005 revisions rendered advisory the enhancement and mitigating factors and removed the presumptive sentence to be imposed by the trial court. *State v. Carter*, 254 S.W.3d 335, 345-46 (Tenn. 2008). In a number of cases following passage of the 2005 amendments, our supreme court signaled that the statutorily proscribed standard of review, de novo with a presumption of correctness, might be at odds with what had become a far more discretionary sentencing scheme. *See, e.g.*, *Carter*, 254 S.W.3d at 344, 346. In *State v. Cross*, 362 S.W.3d 512 (Tenn. 2012), the court again wrestled with the "the precise metes and bounds of appellate review under the current increased trial court discretion structure" but ultimately left the issue unsettled. *State v. Cross*, 362 S.W.3d 512, 529 (Tenn. 2012). The court visited the issue most recently in *State v. Susan Renee Bise*, ___ S.W.3d ___, No. E2011-00005-SC-R11-CD (Tenn. Sept. 26, 2012), and ultimately concluded that "although the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the standard of appellate review." *State v. Susan Renee Bise*, ___ S.W.3d ___, No. E2011-00005-SC-R11-CD, slip op. at 29 (Tenn. Sept. 26, 2012). Observing that a change in our standard of review was necessary to comport with the holdings of the United States Supreme Court, our supreme court "adopt[ed] an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* The court held that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness'" afforded to sentencing decisions of the trial court. *Id.*, slip op. at 30.

The supreme court observed, however, that in making its sentencing decision, a trial court must consider the principles of sentencing enumerated in Code section 40-35-210(b):

> (1) The evidence, if any, received at the trial and the sentencing hearing;
>
> (2) The presentence report;
>
> (3) The principles of sentencing and arguments as to sentencing

-22-

alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

*see Susan Renee Bise*, ___ S.W.3d ___, slip op. at 19 (citing T.C.A. § 40-35-210(b)), 27 n.41. By statute, the trial court must also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5). The court cautioned that, despite the wide discretion afforded the trial court under the revised Sentencing Act, trial courts are "still required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Id.* (citing T.C.A. § 40-35-210(e)). Thus, under the holding in *Susan Renee Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.*, slip op. at 32.

In our view, the trial court did not abuse its discretion when sentencing the defendant. After the drug deal soured, the defendant and Mr. Hargrove returned to Ms. Cain-Beaty's apartment armed with handguns. When denied entry, they kicked in the door and entered the apartment. Once inside, the defendant beat Ms. Cain-Beaty with the handgun, dragged her throughout the apartment by her hair, and kicked her repeatedly. The presentence report established that the defendant had a lengthy criminal record spanning more than two decades.

*Conclusion*

Because no error attends the rulings of the trial court and because we perceive

no deficiency in the convicting evidence, the judgments of the trial court are affirmed.


_____
JAMES CURWOOD WITT, JR., JUDGE